OVERLOOK TERRACE MANAGEMENT CORP., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT, v. RENT CONTROL BOARD OF THE TOWN OF WEST NEW YORK, NEW JERSEY AND TOWN OF WEST NEW YORK, NEW JERSEY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS, AND OVERLOOK TENANTS ASSOCIATION AND JOYCE BARRETT, DAVID HARDY, THELMA SPENCER AND ANGELO ROMANO, INTERVENORS-RESPONDENTS, AND WILLIAM L. JOHNSON, ACTING EXECUTIVE DIRECTOR, NEW JERSEY HOUSING FINANCE AGENCY, INTERVENOR-CROSS-APPELLANT.

Argued April 5, 1976—Decided November 10, 1976.

*Mr. James E. Flynn* argued the cause for appellant (*Mr. James P. Dugan*, attorney).

*Mr. Stephen Skillman*, Assistant Attorney General, argued the cause for cross-appellant (*Mr. William F. Hyland*, Attorney General of New Jersey, attorney; *Mr. Skillman* of counsel; *Mr. Paul C. O'Connell*, Deputy Attorney General, on the brief).

*Mr. Barry Sarkisian* argued the cause for respondents Rent Control Board of the Town of West New York, et al. (*Mr. Sidney I. Turtz*, attorney).

*Mr. Arthur Penn*, Director of Division of Public Interest Advocacy, argued the cause for respondents Overlook Tenants Association, et al. (*Mr. Stanley C. Van Ness*, Public Advocate, attorney).

The opinion of the court was delivered by

SCHREIBER, J. This appeal projects the issue of whether a municipal rent control ordinance may restrict rental increases approved and ordered by the New Jersey Housing Finance Agency, a state agency "exercising public and essential governmental functions", *N. J. S. A.* 55:14J–4(a), for dwelling units in a housing project which is financed, supervised and regulated by that Agency.

The plaintiff Overlook Terrace Management Corp., as the managing agent for Overlook Terrace Corp. (Overlook), a limited dividend housing corporation organized under *N. J. S. A.* 55:16–1 *et seq.* and owner of a 600 unit apartment complex in the Town of West New York, challenged in a complaint in lieu of prerogative writ a rent control ordinance adopted by the Town. The Town and the Rent Control Board, which had been vested with administration of the ordinance, were made parties defendant. The Overlook Tenants Association, an organization composed of resident tenants in the apartment complex, and four individual

tenants, intervened in the proceedings as defendants and the New Jersey Housing Finance Agency (Agency) intervened as a plaintiff.

The defendants' motions for summary judgment were granted. The plaintiffs appealed and the Appellate Division affirmed. We granted the plaintiff's and plaintiff-intervenor's petitions for certification. 69 *N. J.* 76 (1975). We reverse.

In 1968 the Agency, acting pursuant to the New Jersey Housing Finance Agency Law of 1967, loaned $12,674,156 to Overlook to construct a 600 unit moderate-income housing project in West New York. The loan was evidenced by a note and secured by a mortgage. At the mortgage closing, the parties entered into a regulatory agreement. The agreement required Overlook to insert in its leases a covenant that the tenant's family income and other eligibility requirements were to be "substantial and material obligations" of the tenancy. Overlook was required to limit admissions to the project "solely to families of moderate income, as defined by the New Jersey Housing Finance Agency Law of 1967, as amended". Priority for admission was to be granted in the following order: (1) families displaced from the development site, (2) families displaced by urban renewal or highway projects, (3) families in substandard housing, (4) the elderly, and (5) others who met the financial eligibility requirements. If the family income limitations fixed by the Agency were exceeded, the tenancy would be terminated or a rent surcharge imposed. Charges for dwelling accommodations and services were to be in accordance with a rental schedule approved by the Agency.

Without Agency approval Overlook could not convey or encumber the property, assign the rents, or pay out any funds except from surplus cash. Surplus cash were those funds remaining after payment of all expenditures for maintenance to keep the premises in good repair and condition and sums due the Agency on the note and mortgage, and setting aside reserve funds for replacements and other

purposes. Surplus cash could be paid annually to the owners in an amount not to exceed 8% on the equity investment, that being the difference between the principal amount of the mortgage and the total project cost as determined by the Agency. No other compensation or payments were to be made to any officers, directors or stockholders. The premises were to be maintained in good repair and condition. Books and records were to be kept in accordance with the Agency's requirements. A complete annual financial report prepared per the Agency's prescriptions was to be submitted yearly.

Lastly, the agreement provided that the Agency and the Public Housing and Development Authority of the State of New Jersey "shall exercise joint control over the establishment of family income limitations, maximum rental charges applicable to the project and the selection of families who will occupy the Project."

The Agency had adopted standard procedures embodied in a booklet which provided for methods to comply with the requirements of the regulatory agreement and which were binding on the project owner. The manual provided that the leases had to be on forms approved by the Agency, which stated that the rent could be increased by order of the Agency. The maximum gross family incomes were delineated as well as a schedule of surcharges if that income exceeded those maxima. Such surcharges were to be paid to the municipality if it had granted a tax exemption and, if not, then to the Agency for its Housing Finance Fund. *N. J. S. A.* 55:14J–10(b). Insurance requirements, repairs, replacements, and special service needs were detailed.

The manual also stated that no rental increases could be obtained without HFA approval. To that end, an application had to be filed with the Agency. The information to be furnished included the number of units and rooms, capitalization of the project, assessed valuation of land and improvements, reasons for the increase, a three-year

projection of operations on an actual and cash flow basis, a three-year projection of operations *pro forma* on an accrual and cash flow basis, and a schedule of future replacement requirements and statistical backup data for each projection. If the Agency found on preliminary examination that the application warranted consideration, each tenant was to be notified of the filing and the right to a hearing on the proposed increase. The agency has published proposed procedural rules governing rent increases, 7 *N. J. R.* 304 (July 10, 1975), which have not been formally adopted although the Agency has in fact been operating in accordance with them.[1] These rules adopt substantially the same provisions of the manual with respect to the contents of the application and notice to the tenants. The rules recognize the tenant's right to demand a hearing.

In 1974 Overlook submitted an application to the Agency for a rent increase. On June 28, 1974 the Agency ordered a rent increase of $10.50 per room. This increase, to be effective August 1, 1974, equated to a 15% to 25% rental rise for the tenants. It was due exclusively to greater costs related directly to fuel oil, gas, electricity, capital improvements and labor. The Agency found that there was a mandatory need for the increase "to assure [your] tenants all of the essential services" and that if it was not forthcoming, the effect would be to interfere with the monies available for maintenance, to eliminate any return on the equity, and ultimately to impair Overlook's ability to meet its mortgage payments. This in return would endanger the Agency's capability of satisfying obligations on its bonds and notes. The Agency pointed out that the last rent increase of $1.00 per room which had been made one and one-half years ago "was related to the early prevailing inflationary trend."

---

[1]Because of the Appellate Division decision in this case, one proposed rule eliminates the right to a hearing if the tenant has had a hearing before a municipal rent control board. Proposed Rule 5:80–1.16, 7 *N. J. R.* at 305 (July 10, 1975).

The Town of West New York Rent Control Board insisted that it had exclusive control over any rental increases and indicated Overlook would be prosecuted for violating the ordinance by virtue of the proposed increase. Overlook then instituted these proceedings.

At the conclusion of the argument on the summary judgment motion the trial court in an oral opinion found that no expression existed in the New Jersey Housing Finance Agency Law, *N. J. S. A.* 55:14J–1 *et seq.,* which reflected an intent to preempt the field of rent control in publicly financed projects, that the Agency Law was never intended as a rent control statute, and that the municipality's setting rental figures below the limits fixed by the Agency did not conflict with the state Agency's operations. The Appellate Division in an unreported opinion affirmed for the same reasons.

The principal provisions of the West New York rent control ordinance may be summarized as follows: (1) a base rental for housing in residential dwellings was established as of March 1, 1973; (2) no rental increases were allowable thereafter except as permitted by the Rent Control Board under conditions stated in the ordinance; (3) increases were restricted to changes in the Consumer Price Index, with a maximum lid of five percent in any one year; (4) any rental increase which did not conform with the ordinance or regulations promulgated thereunder was void; (5) the landlord was permitted to seek a tax surcharge because of an increase in municipal property taxes; (6) the Rent Control Board was authorized to permit rent increases to enable a landlord to meet his mortgage payments and maintenance; (7) the Board could authorize rental increases "for major capital improvements or services" limited to 10% in any one year; (8) if services or maintenance declined the Rent Control Board could decrease the rent; (9) the Rent Control Board was authorized to promulgate rules and regulations and to hold hearings to perform its delegated

obligations; and (10) the total of all combined rent increases was limited to 15% in any one year.

The power of municipal government to enact rent control ordinances is no longer open to question. *Inganamort, et al. v. Bor. of Fort Lee, et al.,* 62 *N. J.* 521 (1973). In *Brunetti v. Borough of New Milford,* 68 *N. J.* 576 (1975), *Troy Hills Village v. Parsippany-Troy Hills Tp. Council,* 68 *N. J.* 604 (1975) and *Hutton Pk. Gardens v. Hutton Lafayette Apts. Co.,* 68 *N. J.* 543 (1975), the constitutionality of several comparable municipal rent control ordinances was upheld, but Justice Pashman in writing for the majority in those cases pointed out that price controls which did not yield the owner a fair return were confiscatory and illegal. He added:

> * * * Every rent control ordinance must be deemed to intend, and will be so read, to permit property owners to apply to the local administrative agency for relief on the ground that the regulation entitles the owner to a just and reasonable rate of return. [*Hutton Pk. Gardens v. Hutton Lafayette Apts. Co., supra,* 68 *N. J.* at 572].

To that end there was spelled out in *Troy Hills Village, supra,* 68 *N. J.* at 628–630, standards and criteria of a fair return in a rent control context.

The New Jersey Housing Finance Agency Law of 1967 was adopted to alleviate the need for adequate housing of families of moderate income "at a rental level within their means." *N. J. S. A.* 55:14J-2.[2] The statute declared that the building industry could meet that need only if a public agency were created to encourage the investment of private capital and stimulate construction of dwelling units through the use of public financing and public loans.

Under the act, which is administered by the Agency, after the municipality by formal resolution recites the need for

---

[2] In its pamphlet on Programs and Purposes (1968), the Agency wrote that it was created to help meet the "need for adequate, safe and sanitary dwellings for many families of moderate income who cannot afford today's rents. . . ."

such a project, funds are to be advanced to qualified sponsors for construction of housing projects. *N. J. S. A.* 55: 14J–6(a) and (b). These could not exceed 90% of the total project cost (100% if the sponsor is a corporation organized not for profit) and the interest rate is to be established at the lowest level consistent with the Agency's cost of operation. *N. J. S. A.* 55:14J–9(a)(2) and (3). Rents are to be limited to those established by the Agency. *N. J. S. A.* 55:14J–9(a)(5). In a mortgage foreclosure proceeding the court is "authorized to make an order increasing the rental." *N. J. S. A.* 55:14J–13. The sponsor's return is restricted to no more than 8% per annum on its investment. *N. J. S. A.* 55:14J–9(a)(6). Tax exemptions granted by the municipality have to remain effective for the entire period of the loan. *N. J. S. A.* 55:14J–9(a)(8).

As a loan condition the Agency has the power to enforce, by court action if necessary, the rental schedules and tenant income limits imposed by the Agency. *N. J. S. A.* 55:14J–9(b)(5). If a sponsor violates any provision of its agreement with the Agency or of the act, or the Agency determines that repayment of a loan is in jeopardy, the Agency is authorized to remove all directors and officers and replace them with persons of its own choosing. *N. J. S. A.* 55:14J–9(b)(6).

Prospective tenants are limited to moderate income families whose gross income does not exceed six times the annual rental or seven times if there are three or more dependents. *N. J. S. A.* 55:14J–10(a). The maximum family income cannot exceed $15,000, although this figure is subject to Agency adjustment. *N. J. S. A.* 55:14J–10(a). The Agency is required to make periodic examinations of the family income and to terminate the tenancy if the income exceeds the maximum by 25%. *N. J. S. A.* 55:14J–10(b). Under some circumstances the tenant is permitted to continue to reside in the apartment, upon payment of a surcharge, which is to be transmitted to the municipality or the Housing Finance Fund. *Id.* The Agency is authorized

to establish priority rental categories, the foremost to be for persons displaced by urban renewal projects, highway programs or other public works. *N. J. S. A.* 55:14J–11.

The financing scheme contemplates the issuance of bonds by the Agency, the principal and interest of which is to be met by funds received by the Agency from the projects which it sponsored. *N. J. S. A.* 55:14J–15(a) and (b). Revenues from a group of projects can be pledged to satisfy the obligations of a particular bond issue. *N. J. S. A.* 55:14J–15(b). The Agency is required to maintain a minimum capital reserve sufficient in amount to pay the principal and interest due on the bonds in a calendar year. *N. J. S. A.* 55:14J–20(a). If the minimum requirement is violated, the deficiency shall be appropriated by the Legislature and paid to the Agency. *N. J. S. A.* 55:14J–21. The Agency's bonds are declared to be "for an essential public and governmental purpose," are tax exempt, and legal investments. *N. J. S. A.* 55:14J–24 and –25.

The Agency is not only authorized to adopt rules and regulations "necessary or desirable" to carry out the act's purposes, *N. J. S. A.* 55:14J–34(f), but also to issue subpoenas and conduct hearings, *N. J. S. A.* 55:14J–34(c) and (b).

It is the expressed "intent of the Legislature that in the event of any conflict or inconsistency in the provisions of this act and any other acts concerning qualified housing sponsors or any rules and regulations adopted" by the Agency, this act shall prevail. *N. J. S. A.* 55:14J–30(a). Lastly it is important to note that the Legislature has as a matter of policy declared that:

> The powers enumerated in this act shall be interpreted broadly to effectuate the purposes thereof and shall not be construed as a limitation of powers. [*N. J. S. A.* 55:14J–39].

■■ Overlook contends that the West New York Rent Control Ordinance is inoperative with respect to moderate income housing projects supervised by the Agency because

the State has preempted this particular area from municipal regulation. Preemption is a judicially created principle based on the proposition that a municipality, which is an agent of the State, cannot act contrary to the State. *Summer v. Teaneck,* 53 *N. J.* 548, 554 (1969). Preemption analysis calls for the answer initially to whether the field or subject matter in which the ordinance operates, including its effects, is the same as that in which the State has acted. If not, then preemption is clearly inapplicable. An affirmative answer calls for a further search for "[i]t is not enough that the Legislature has legislated upon the subject," *Summer v. Teaneck, supra* at 554; *Masters-Jersey, Inc. v. Mayor and General Council of Borough of Paramus,* 32 *N. J.* 296 (1960); *Mogolefsky v. Schoem,* 50 *N. J.* 588, 598 (1967).

▮ Pertinent questions for consideration in determining applicability of preemption are:

1. Does the ordinance conflict with state law, either because of conflicting policies or operational effect (that is, does the ordinance forbid what the Legislature has permitted or does the ordinance permit what the Legislature has forbidden)? *Auto-Rite Supply Co. v. Mayor and Township Committeemen of Woodbridge,* 25 *N. J.* 188 (1957).

2. Was the state law intended, expressly or impliedly, to be exclusive in the field? *Township of Chester v. Panicucci,* 62 *N. J.* 94, 99–100 (1973); *Kennedy v. City of Newark,* 29 *N. J.* 178, 187 (1959).

3. Does the subject matter reflect a need for uniformity? *In re Public Service Electric and Gas Co.,* 35 *N. J.* 358, 371 (1961); *So. Ocean Landfill v. Mayor & Coun. Tp. of Ocean,* 64 *N. J.* 190 (1974). *Inganamort, et al. v. Bor. of Fort Lee, et al.,* 62 *N. J.* at 528–530 has perceived "subject matter inherently in need of statewide treatment" in terms of jurisdictional power, posing the question of whether the State Constitution has prohibited delegation to the municipality of power to enact ordinances in a certain sphere.

4. Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation? *Ringlieb*

v. *Tp. of Parsippany-Troy Hills,* 59 *N. J.* 348 (1971); *State v. Ulesky,* 54 *N. J.* 26 (1969).

5. Does the ordinance stand "as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Legislature? *Hines v. Davidowitz,* 312 *U. S.* 52, 67–68, 61 *S. Ct.* 399, 404, 85 *L. Ed.* 581, 587 (1941).[3]

Generally, justification for enactment of municipal rent control ordinances has been grounded in a critical housing shortage and the "evil of inordinate rent arising out of a housing shortage." *Inganamort, et al. v. Bor. of Fort Lee, et al., supra,* 62 *N. J.* at 527.[4] Rent control is a tenant palliative to soften the impact of that shortage. The New Jersey Housing Finance Agency Law deals with a facet of the same problem, a housing shortage and the consequent inability of moderate income families to pay the rentals.[5] The law, however, attacks the problem not only

---

[3]A comparable analysis may be made when resolving certain Federal and State preemption issues. Compare Comment, "Parker v. Brown: A Preemption Analysis," 84 *Yale L. J.* 1164 (1975) with Note, "Conflicts Between State Statutes and Municipal Ordinances." 72 *Harv. L. Rev.* 737 (1959).
*See also Lodge 76, Int. Ass'n of Machinists, et al. v. Wisconsin Employment Relations Comm., et al.,* 427 *U. S.* 132, 96 *S. Ct.* 2548, 49 *L. Ed.* 396 (1976).

[4]The West New York ordinance recited that a reason for adoption of the ordinance was "a critical shortage of housing space" in the Town.

[5]Paul N. Ylvisaker, then Commissioner of Department of Community Affairs, in testifying at the public hearing on March 30, 1967, before Assembly and Senate Committees on the proposed law said:
* * * Decent housing is becoming more and more difficult for too many of our citizens to come by, both in terms of distance, the convience, and especially in terms of cost. We will introduce figures and statistics into the record here, which will show how many of our citizens in the State of New Jersey are experiencing difficulty within their income and within their travelling distance, of finding the suitable and decent accommodations we want them to have. We are trying to guarantee by this proposed legislation that they will get it. [*Hearings* at 5–6].

from the standpoint of rent fixing but also from the view-point of creating additional dwelling space.

Under both remedies, State and municipal, rent is fixed. In both schemes, rent increases are subject to regulation, by the Agency for the State and by the Rent Control Board for the municipality. In fixing the amount of increases both consider not only the investment of the owner, but the impact on the tenant. However, the rent levels arrived at may not be the same, for the municipal and State guidelines are not identical. Both call for a return to the owner — the State which has restricted the return to a maximum of 8% on investment, the municipality to a fair return on the value of the landlord's property, criteria which contemplate ranges of percentages.[6] The State rentals must be set to satisfy maintenance costs, operating expenses and debt requirements. Under the municipal controls, rental increases are keyed to Consumer Price Index changes with limited hardship increases. Under the ordinance the total of all increases cannot exceed 15% in one year, although that limitation may be less than that required for an Agency financed project. The municipal ordinance contemplates officers' salaries as appropriate expenses. *See Troy Hills Village v. Parsippany-Troy Hills Tp. Council, supra,* 68 *N. J.* at 626–627. The Agency prohibits such expenses. The two regulatory agencies may reach different results in determining the reasonableness of other expense items. Under the ordinance, rent increases are available if the Consumer Price Index rises. This is not true for the Agency financed projects. The total effect is that the amount of a rental increase fixed by the New Jersey Housing Finance Agency probably will conflict with that determined by the local Rent Control Board.

It is not sound to reason that, so long as the municipally fixed rent is lower than that prescribed by the Agency, no conflict exists. In that circumstance the higher level which

---

[6] Overlook's 1973–1974 budget provided for no return on equity and its 1974–1975 budget for a return substantially below 8%.

the State orders is expressly forbidden by the municipal Rent Control Board.[7] The conflict is obvious. As Chief Justice Weintraub in *Summer v. Teaneck, supra,* succinctly put it — "[A]n ordinance will fall if it ... forbids what a statute expressly authorizes." [53 *N. J.* at 554]. Adherence to the Agency's ceiling to carry out the State mandated responsibilities of the Agency and the project sponsor is required. The Agency fixes the rents predicated upon the funds needed to satisfy the Agency's bond requirements, interest and principal, appropriate maintenance, and a return on the owner's investment (not to exceed 8%). To permit the local Rent Control Board, even though it may consider the identical factors, to superimpose its findings on those of the State created Agency, would elevate a municipality's power beyond that of the State.

■ There is a general presumption that state legislation creating a state agency preempts municipal control of that state agency. *Bloomfield v. New Jersey Highway Authority,* 18 *N. J.* 237 (1955). *See Cervase v. Kawaida Towers, Inc.,* 124 *N. J. Super.* 547, 559, 560 (Law & Ch. Divs. 1973), aff'd o. b. 129 *N. J. Super.* 124 (App. Div. 1974). In *N. J. Turnpike Authority v. Sisselman, et al.,* 106 *N. J. Super.* 358, 366 (App. Div.), certif. den. 54 *N. J.* 565 (1969), Judge Kilkenny wrote that "legislatively created agencies, authorized by the superior governmental authority of the State, may not be subjected to rules and regulations of local governing boards and agencies, in the absence of clear language subjecting the state-created agency to the jurisdiction of local boards." Such language is missing in the legislative history and terms of the New Jersey Housing Finance Agency Law of 1967. The position seems con-

---

[7] The Agency approved and ordered the rent increase of $10.50 per room effective August 1, 1974. After the dismissal of the complaint the Agency proceeded before the local Rent Control Board which permitted an increase of 8% which was substantially less than the $10.50 per room, an amount which as noted before equated to increases of 15% to 25%.

traindicated since the Agency Law governs with respect to any other inconsistent state laws and the expressed legislative intent that it be broadly construed to effectuate its purposes. *N. J. S. A.* 55:14J–39.

The importance of having the Agency establish rent levels in its projects is particularly significant in light of the manner in which the Agency raises its funds, which in turn the Agency lends for the construction of housing projects. Because of its governmental status and ability to control the rents in the housing projects, the Agency has been able to raise funds at lower interest rates than the private builder. The sale of the Agency's bonds at low rates of interest redounds to the benefit of the tenants because the interest demanded on the housing owner's mortgage obligation to the Agency has been correspondingly low. Revenues from the housing projects, derived solely from the rents, are pledged to secure the interest and principal amortization of the Agency's bonds. As noted above, revenues from several projects which may be located in many municipalities are pledged to meet the financial requirements of a single bond issue. A financial deficiency in one project could affect others. If, because of restrictions of the West New York Rent Control Board, the West New York project does not yield its proper share of cash for that purpose, other projects located in other municipalities or the State would be called upon to make up that deficiency. It is incongruous to require that the municipality must express a need for the Agency subsidized middle-income housing project before it can become a reality and yet to permit it subsequently to throttle the project's revenue producing capability to meet its financial requirements.

The defendants place great stress on *Helmsley v. Borough of Fort Lee*, 362 *F. Supp.* 581 (D. N. J. 1973); *Stoneridge Apts. Co. v. Lindsay*, 303 *F. Supp.* 677 (S. D. N. Y. 1969); and *Columbia Plaza Limited Partnership, et al. v. Cowles, et al.*, 403 *F. Supp.* 1337 (D. D. C. 1975). In those cases housing was financed under the National

Housing Act, 12 *U. S. C.* § 1702 *et seq.*, by having the Department of Housing and Urban Development (HUD) insure mortgage loans. The issue concerned the jurisdiction of municipal rent control over such housing. These cases deal with preemption predicated on the Supremacy Clause of the U. S. Constitution, Art. VI, and the Interstate Commerce Clause, Art. I, § 8, with respect to a subject matter, landlord-tenant relations, which has traditionally been a matter of local *vis-a-vis* federal interest. Where the subject matter is of that character, at least in the field of interstate commerce, federal regulation is not deemed preemptive unless the regulation scope permits no other conclusion or Congressional intent has been so expressed or there are persuasive reasons for preemption. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 *U. S.* 132, 83 *S. Ct.* 1210, 10 *L. Ed.* 2d 248, reh. den. 374 *U. S.* 858, 83 *S. Ct.* 1861, 10 *L. Ed.* 2d 1082 (1963); *Huron Portland Cement Co. v. Detroit,* 362 *U. S.* 440, 80 *S. Ct.* 813, 4 *L. Ed.* 2d 852 (1960); *See* Note "State Environmental Protection Legislation and the Commerce Clause," 87 *Harv. L. Rev.* 1762 (1974). Resolution of preemption between the federal government and the state under the Commerce Clause of the Federal Constitution calls into play different policy reasons and principles than when the preemption issue involves the state and its municipal agent. *Cf. Machinists v. Wisconsin Emp. Rel. Comm'n,* —— *U. S.* ——, 96 *S. Ct.* 2548 (1976), 49 *L. Ed.* 2d 396 (1976).

Factually the HUD cases are substantially different. No funds are advanced by HUD and the revenues from the housing projects are not pledged as security for any government securities. In *Helmsley v. Borough of Fort Lee, supra,* 362 *F. Supp.* at 590, the court found that the National Housing Act was "not a rent control mechanism," whereas the New Jersey Housing Finance Law is. HUD at the time of that case took the position that there was no preemption. 362 *F. Supp.* at 591 n. 11. HUD subsequently adopted a regulation which declares that it has preempted

the rent control field. 24 *C. F. R.* § 403, 40 *Fed. Reg.* 49318. Since its adoption HUD preemption over municipal rent control has been recognized. In *Druker v. City of Boston*, 410 *F. Supp.* 1314 (D. Mass. 1976), municipal rent control was held ineffective because it frustrated the purposes and objectives of the National Housing Act. Though the local rent control criteria were the same as HUD, different weight was given to various factors. For example, in projecting income, the local rent agency used a vacancy rate of 5% and HUD 7%. The two regulatory schemes produced different results. The rents fixed by HUD were those necessary to attain the National Housing Act goals, namely yields sufficient to cover debt service, expenses and investor return. The court concluded the two regulatory schemes were in conflict and noted that HUD which had previously not intervened in cases of this type was now satisfied that a conflict existed.[8] Even if we were to find the federal preemption cases applicable, which we do not, we find the rationale in *Druker* more persuasive.[9]

For reasons previously stated rents controlled and fixed by the New Jersey Housing Finance Agency in middle income housing made available under the New Jersey Housing Finance Agency Law are not subject to municipal rent control ordinances. The state law has preempted the subject matter — rent fixing. This is evidenced by the conflict between the State and municipal regulatory schemes, the legislative intent that the state law be exclusive, the need for uniformity in rental treatments in the middle-income housing projects, the comprehensive nature of the state plan which

---

[8]HUD was not a party in the *Helmsley or Stoneridge* cases.

[9]*Edgemere at Somerset v. Johnson, et al.*, 143 *N. J. Super.* 222 (Cty. Ct. 1976) and *Levin-Sagner-Orange v. Rent Levelling Board of Orange*, 142 *N. J. Super.* 429 (Law Div. 1976) reached the same result as *Druker*. See also *Glasco v. Hills*, 412 *F. Supp.* 615 (D. N. J. 1976) where the court held federal preemption existed irrespective of the validity of the HUD regulation.

precludes municipal regulation, and the fact that municipal rent control ordinances could otherwise frustrate the full purposes of the state law.

The judgment is reversed.

PASHMAN, J. (dissenting). I disagree with the majority's conclusion that the Legislature intended to foreclose local rent control of housing projects financed by the New Jersey Housing Finance Agency (HFA) when it authorized the HFA to set a ceiling on rents charged by owners. As the trial court observed in granting defendants' motion for summary judgment, the pertinent statute, *N. J. S. A.* 55:14J–1 *et seq.,* is primarily a financing mechanism for the construction and rehabilitation of housing for moderate income families. That provision is only incidentally concerned with rent control as a method of ensuring that funds allocated pursuant to it are used to provide dwelling units which are within the financial means of the intended class of beneficiaries. In no sense does it resemble a comprehensive rent control statute which is designed to preempt action by local municipalities. *See Kennedy v. City of Newark, 29 N. J.* 178 (1959). Therefore, I would affirm the Appellate Division's holding that the Town of West New York's ordinance applies to the plaintiff's housing project.

The majority essentially argues that there is a conflict between the state law and the municipal act because the two regulatory agencies may approve rent increases of differing magnitude.[1] Accordingly, because it finds that the local ordi-

---

[1] The HFA and the Rent Control Board of West New York did reach different results in this case. The HFA approved plaintiff's requested increase of $10.50 per room effective August 1, 1974. This amounted to a 20% to 30% increase, depending on the number of rooms. After dismissal of plaintiff's complaint challenging the Rent Board's jurisdiction, it applied for an increase and was awarded an 8% raise, 5% for a normal cost of living increment plus a 3% hardship allowance.. However, the plaintiff failed to exhaust the available procedures by contending on appeal that the board's increase

nance would frustrate the State policy, it concludes that the rent control regulation must yield to State law under principles of preemption.

This Court has already ruled that preemption does not prevent the vesting of rent control powers in municipalities. In *Inganamort v. Ft. Lee,* 62 *N. J.* 521 (1973), we held that regulation of rents was within the powers delegated by the Legislature to municipalities under *N. J. S. A.* 40:48–2; the Court rejected the suggestion that the subject matter necessarily called for uniform statewide treatment and concluded that the complete legislative withdrawal from the area of rent control removed any possibility of conflict between state and local acts. Moreover, we noted the possible benefits to be derived from local initiative:

A problem may exist in some municipalities and be trivial or non-existent in others. And if the evil is of statewide concern, still practical considerations may warrant different or more detailed local treatment to meet varying conditions or to achieve the ultimate goal more effectively.

[62 *N. J.* at 528]

Furthermore, we found in that case that the mere existence of statutes dealing generally with the landlord and tenant relationship did not pose an irreconcilable conflict requiring preemption. *Id.* at 537–538.

However, legislative inaction has been the source of some confusion. The absence of a uniform enabling act has led to claims of uncertainty and uneven results by developers and owners. Furthermore, in *Brunetti v. Borough of New Milford,* 68 *N. J.* 576, (1975), we struck down a provision of a local ordinance which duplicated the State laws setting forth enumerated grounds for eviction, reasoning that the Legislature had clearly evinced its intent to preempt this

denied him a just and reasonable return. *See Hutton Park Gardens v. West Orange Town Council,* 68 *N. J.* 543, 571 (1975) ; *Troy Hills Village v. Parsippany-Troy Hills Tp. Council,* 68 *N. J.* 604, 621 (1975). See *Infra* at 472, 473.

narrow field by passing *N. J. S. A.* 2A:18–61.1. *Id.* at 603. Consequently, this Court has expressly urged the Legislature to consider enactment of a comprehensive state rent control provision. *Hutton Pk. Gardens v. West Orange Town Council*, 68 *N. J.* 543, 574 (1975).

Contrary to the majority, I find little evidence suggesting a legislative intent to take a preemptive position when it enacted *N. J. S. A.* 55:14J–1 *et seq.* It is apparent that when HFA was given the power under *N. J. S. A.* 55:14J–9 to limit owners and principals or stockholders of projects to specified charges and fees, the subject matter of the local rent control ordinances was touched upon. But this fact alone is not sufficient to justify a conclusion that the Legislature has preempted the field. *Tp. of Chester v. Panicucci*, 62 *N. J.* 94, 102 (1973); *State v. Uleskey*, 54 *N. J.* 26, 29 (1969); *Mogolefsky v. Schoem*, 50 *N. J.* 588, 598 (1967). On the contrary, the Legislature's brief treatment of the issue may be viewed as indicative of its decision not to retain jurisdiction over rent control matters. As Chief Justice Weintraub observed in reviewing the doctrine of preemption in *Summer v. Teaneck*, 53 *N. J.* 548 (1969):

> It is not enough that the Legislature has legislated upon the subject, for the question is whether the Legislature intended its action to preclude the exercise of the delegated police power. . . . *The ultimate question is whether, upon survey of all the interests involved in the subject, it can be said with confidence that the Legislature intended to immobilize the municipalities from dealing with local aspects otherwise within their power to act.*
>
> [53 *N. J.* at 554–555; emphasis supplied]

The legislative history of Assembly Bill 770 (introduced March 13, 1967), the foundation for *N. J. S. A.* 55:14J–1 *et seq.*, suggests that virtually no thought was given to the issue. At the public hearings on the legislation, only two witnesses made passing references to rent control, and their remarks failed to clarify whether they were referring to local

controls or proposing State regulation.[2] More recently, a bill was introduced in the Legislature to exempt HFA projects from municipal controls, but it was withdrawn after being referred to committee.[3]

The statutory language is equally devoid of an unequivocal statement of legislative intent. *N. J. S. A.* 55:14J–2 merely refers to the need for a public agency to stimulate construction and rehabilitation by the building industry to provide "a fully adequate supply of safe and sanitary accommodations at rental or carrying charges which families of moderate income can afford." *N. J. S. A.* 55:14J–9(a)(5) fulfills the statutory purpose by requiring inclusion of a term in the loan agreement subjecting rents to agency approval, and directing the plaintiff to make accommodations available at charges *not exceeding* those established in accordance with a schedule approved in writing by the agency. Taken as a whole, these terms suggest an overriding preoccupation with providing dwelling units within the financial means of moderate income families, not with rent control *per se. Cf.*

---

[2] Mr. Ernest Erber, a professional planner and staff member of the non-profit, research and planning agency, Regional Plan Association, testified:

*A second safeguard should require rent control* and dividend limitation to be in effect for a sufficiently long term to prevent misuse of state aid with the intent of early conversion to open market operation. [Public Hearing on *Assembly Bill* 770 before Assembly Committee on County and Municipal Government at 14A (1967) ; emphasis added].

Mr. Oliver Lofton, Administrative Director of Newark Legal Services Project whose testimony was primarily directed at an urban dweller relocation bill (A–767) then under consideration, suggested:

I would, therefore, respectfully commend to this Committee not only this piece of legislation before it [A–767] but also to *give consideration to additional legislation which will impose rent controls* to insure that safe, decent and sanitary housing is kept within the financial means of a substantial portion of the target population * * *

[*Hearings, supra* at 49A–50A ; emphasis added].

[3] The act was introduced in January 1975 as Assembly Bill 2333 (1975). It was withdrawn on February 24, 1975.

*New Jersey Mortgage Finance Agency v. McCrane,* 56 *N. J.* 414, 420–421 (1970); *Roe v. Kervick,* 42 *N. J.* 191, 222 (1964).

Admittedly, the regulations adopted by the HFA pursuant to *N. J. S. A.* 55:14J–34(f) do permit the executive director to vary rentals "so as to secure, together with all other income of the sponsor, sufficient income for it to meet within reasonable limits all necessary payment, to be made by the sponsor, of all expenses including fixed charges, debt service of the Housing Finance Fund requirement, reserves and dividends as authorized by the executive director." *N. J. A. C.* 5:18–1.2. This provision reflects the agency's interest in maintaining the solvency of a housing sponsor, while limiting the return on investment to no more than 8% *per annum. N. J. S. A.* 55:14J–9(a)(6). But, it does not follow that local rent control will impair the functioning of the HFA program. Significantly, our prior decisions hold that local rent control schemes cannot deny owners a just and reasonable rate of return on their investment. *Hutton Park Gardens v. West Orange Town Council, supra,* 68 *N. J.* at 572. As applied to these facts, this guarantee necessarily would include sufficient income for housing sponsors to meet their financial obligations to the HFA. We made this explicit in *Troy Hills Village v. Parsippany-Troy Hills Tp. Council,* 68 *N. J.* 604 (1975). In detailing the standards and criteria of a fair return in the context of rent control, we said:

. . . [T]o be "just and reasonable" a rate of return must be high enough to encourage good management including adequate maintenance of services, to furnish a reward for efficiency, to discourage the flight of capital from the rental housing market, and *to enable operators to maintain and support their credit.*
[68 *N. J.* at 629; emphasis supplied.]

The majority correctly notes that the criteria applied by a municipal rent control board may yield a different result than the figure set by the HFA. However, it errs in failing

to note the possibility of resolving such a conflict. If the HFA ceiling is lower than the rent board's maximum, then the housing sponsor will be held to his contractual commitment and the state policy will be served. If the HFA fixes the rent at a higher figure, the owner will still be entitled to demonstrate that the rent board's figure denies him a fair return. To the extent that the HFA's calculation reflects a more accurate picture of costs, it will be persuasive evidence of the rent board's error. Yet a finding by a court that the housing sponsor would be able to meet all financial obligations under the lower figure, would mean that the equally important state goals of keeping rents within reasonable limits and maintaining the fiscal integrity of the projects would be served.

Perhaps it is possible to argue that such restrictions deter prospective investors and weaken the bond market. However, these detrimental consequences are factually unsupported and prematurely raised. The contention that upholding the ordinance would jeopardize debt repayment has only been alluded to in the affidavit of the HFA Controller. Even conceding the majority's point, the proper disposition of this case would be a remand for expert testimony and introduction of evidence.

Equally unpersuasive is the majority's contention that this outcome falls within the class of conflicts referred to by Chief Justice Weintraub in *Summer v. Teaneck, supra. N. J. S. A.* 55:14J-9 does not *order* the housing sponsor to charge a given price for accommodations; it simply sets a maximum above which the owner cannot go. Given the hazy legislative intent behind this enactment, there is no reason why the municipality should not be able to impose more restrictive measures which are geared to local conditions, as long as the HFA sponsor is guaranteed a just return. The pattern of HFA regulation suggests only a minimal interest in state-wide uniformity, and hence, fails to satisfy one of the reasons courts normally consider in applying the preemption

doctrine. The executive director's power to approve rent increases is oriented towards *ad hoc* decisions which turn on the particular character of each project. Local rent control boards can serve that same function with as much efficiency, and they are likely to be more familiar with local factors bearing on the grounds for an increase. *See, Inganamort v. Ft. Lee, supra,* 62 *N. J.* at 529; *Summer v. Teaneck, supra,* 53 *N. J.* at 554–555. This is unlike the state regulation of public utilities which requires a regional approach. *So. Ocean Landfill v. Mayor & Coun. Tp. of Ocean,* 64 *N. J.* 190, 195 (1974); *Ringlieb v. Tp. of Parsippany-Troy Hills,* 59 *N. J.* 348 (1971).

The contrary result produces the incongruous situation of weakening protections for moderate income families, which are declared beneficiaries of HFA housing, by excluding them from the larger class of tenants covered by rent control. Under the majority's decision, more affluent West New York tenants will be protected against inordinate rent increases while moderate income families will be subject to the attenuated controls of the agency. We should interpret the statute to give full effect to the consequences intended by its draftsmen and hold HFA moderate income tenants within the protective scope of municipal rent control.

This result comports with the decisions of federal courts which have addressed an analogous question in cases involving housing financed under the National Housing Act, 12 *U. S. C.* § 1702 *et seq.,* by mortgage loans issued by the Department of Housing and Urban Development (HUD). These courts have held that such housing is subject to municipal rent control notwithstanding the assertion of federal preemption. *See, e. g., Helmsley v. Borough of Fort Lee,* 362 *F. Supp.* 581 (D. N. J. 1973); *Druker v. Sullivan,* 322 *F. Supp.* 1126, 1129–1130 (D. Mass. 1971), subsequent opinion 334 *F. Supp.* 861 (D. Mass. 1971), aff'd, 458 *F.* 2d 1272 (1 Cir. 1972); *Stoneridge Apts. Co. v. Lindsay,* 303 *F. Supp.* 677 (S. D. N. Y. 1969); *Columbia Plaza Limited Partner-*

*ship, et al. v. Comles, et al.,* 403 *F. Supp.* 1337 (D. D. C. 1975). *See also, Stuyvesant Town v. Ligham,* 17 *N. J.* 473 (1955). These decisions conclude that the National Housing Act is not a rent control statute, and that there is nothing to prevent the enforcement of local rent ceilings below the maximum level fixed by the Secretary of HUD. The reasoning in the HUD cases applies in full measure to the HFA cases.

The majority cites *Druker v. City of Boston,* 410 *F. Supp.* 1314 (D. Mass. 1976) in support of the contrary rationale, namely, that municipal or state rent control of § 221 (d) (1) projects conflicts with HUD's procedures. The court noted the promulgation of a regulation by HUD expressly declaring its intention to preempt the field, *see* 24 *C. F. R.* § 403, but grounded its decision on a conflict between the two schemes. *Id.* at 1321. In this case, however, there has been no equivalent showing of conflict which jeopardizes the solvency of the housing projects and no clear cut announcement of regulatory policy.[4]

The remedy for housing shortage — publicly financed housing — should not be promoted at the expense of municipal rent control. This is not the time to erode the ability of local government and this Court to assist all the people, regardless of income, to secure civilized dwellings. The Legislature had no such intent. Nor do I.

I dissent and would affirm the judgment of Judge Larner as trial judge and the Appellate Division.

*For reversal*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, CLIFFORD and SCHREIBER and Judge CONFORD—6.

*For affirmance*—Justice PASHMAN—1.

---

[4]The plaintiffs in *Druker* presented evidence of their financial circumstances, which had caused them to default on some of their mortgages. *Id.* at 1317.