Counsel for defendants will submit an appropriate order.

THE OCEAN COUNTY UTILITIES AUTHORITY, PLAINTIFF, v. THE PLANNING BOARD OF THE TOWNSHIP OF BERKELEY, OCEAN COUNTY, NEW JERSEY, DEFENDANT, BRICKTOWN MUNICIPAL UTILITIES AUTHORITY, AMICUS CURIAE.

Superior Court of New Jersey
Law Division Ocean County

Decided May 13, 1987.

622

*Richard H. Woods* for plaintiff (*Hiering & Dupignac*, attorneys).

*Edward F. Liston, Jr.,* for defendant (*Carluccio & Liston,* attorneys).

*Barbara Villano amicus curiae* (*Kelly & Villano,* attorneys).

CLYNE, J.S.C.

The question before the court is whether a county utilities authority must obtain local planning board approval before constructing a sludge management facility. During the pendency of the matter, it came to the attention of the court that contractors' bids were about to expire. Counsel therefore agreed to have the court render its decision in an expedited, abbreviated form. That decision was spread upon the record May 8, 1987. It was further understood that the court would thereafter render this more detailed analysis of its decision.

The Ocean County Utilities Authority, hereinafter OCUA, plans to construct a sludge management facility to enable it to meet the present and future sludge disposal needs in Ocean County. Under its plan, the OCUA will collect sludge presently generated at its three regional treatment facilities in Brick, Berkeley and Stafford Townships, and will transport it to the new central sludge management facility. This new central facility will be situated entirely within the boundaries of the OCUA's already existing central water pollution control complex in Berkeley Township. There, the sludge will be dried and pelletized for marketing as a soil conditioner with fertilizer value.

Before submitting its application to defendant Berkeley Township Planning Board, plaintiff had already received numer-

ous approvals from federal, state and county agencies. The list of agencies included the United States Environmental Protection Agency, New Jersey State Department of Environmental Protection, The Department of Community Affairs, the Ocean County Planning Board and the Freeholders Solid Waste Advisory Council. Ultimately, the OCUA applied to the Berkeley Township Planning Board for site plan approval and a height variance for three silos that are part of the proposed facility. After several hearings, defendant Berkeley Township, by resolution dated March 23, 1987, denied the application, asserting that the applicant failed on eight separate concerns to meet its burden of proof.

Prior to the planning board hearings on this matter, plaintiff OCUA had reserved the right to challenge the board's jurisdiction to review the site plan and to grant variances. The OCUA contended that it had submitted its plan for formal approval by the planning board only because of the uncertainty surrounding any obligation by the OCUA to do so pursuant to the holding in *Shupack v. Manasquan River Regional Sewerage*, 194 *N.J.Super.* 199 (App.Div.1984).

In *Shupack*, a sewerage authority had planned to build a sewerage pumping station as part of its activities authorized by both the Sewerage Authority Law, *N.J.S.A.* 40:14A–1 *et seq.* and the Water Pollution Control Act, *N.J.S.A.* 58:10A–1 *et seq.* The court concluded that neither statute preempted the field traditionally reserved to the planning board and, therefore, the sewerage authority was not absolved of its obligation to obtain a local construction permit or site plan approval.

*Shupack* is inapplicable to the case at bar for two reasons. First, the activities of the OCUA as regards the proposed facility are not pursuant to either of the aforementioned statutes. Rather its present activities fall squarely within the purview of the Solid Waste Management Act, *N.J.S.A.* 13:1E–1 *et seq.* Second, the Solid Waste Management Act creates a comprehensive regulatory scheme which preempts from local regulation facilities such as the one here involved.

■ No one questions that the purpose of the proposed facility is to handle sewage sludge. Moreover, review of the following definitions makes clear that the sewage sludge to be handled by the facility is "solid waste" regulated by the Solid Waste Management Act. *N.J.S.A.* 13:1E–1 *et seq.* (hereinafter the act). As to "solid waste," the act provides:

> For purposes of this act, unless the context clearly requires a different meaning:
>
> (a) "Solid waste" means garbage, refuse, and other discarded materials resulting from industrial, commercial and agricultural operations, and from domestic and community activities, and shall include all other waste materials including liquids ... except for solid animal and vegetable wastes collected by swine producers licensed by the State Department of Agriculture to collect, prepare and feed such wastes to swine on their own farms. [*N.J.S.A.* 13:1E–3(a)]

Another definition for "solid waste" appears at *N.J.A.C.* 7:26–1.6:

> (a) A solid waste is any garbage, refuse, sludge or any other waste material except it shall not include solid animal or vegetable wastes collected by swine producers, licensed by the State Department of Agriculture, who collect, prepare and feed such wastes to swine on their own farms.
>
> (b) An "other waste material" is any solid, liquid, semisolid or contained gaseous material, resulting from industrial, commercial, mining or agricultural operations, or from community activities....

"Sludge" and "sewage sludge" are also defined in the Administrative Code:

> "Sewage sludge" means the solid residue consisting of sewage solids combined with water and dissolved materials in varying amount.
>
> "Sludge" means any solid, semisolid or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant or air pollution control facility exclusive of the treated effluent from a wastewater treatment plant. [*N.J.A.C.* 7:26–1.4]

■ There can be little doubt that sludge is solid waste within the purview of the Solid Waste Management Act and the accompanying New Jersey Administrative Code regulations. Defendant argues that notwithstanding the fact that sludge is solid waste, the facility in question is not a resource recovery facility, but is instead more akin to a "recycling" or "reclamation" facility. Therefore, defendant contends, inasmuch as no specific guidelines or criteria to regulate such facilities have

been promulgated, no clear intention to preempt the field can be shown to so eliminate regulation by local planning boards.

This court concludes that the sludge conversion facility contemplated by plaintiff is a resource recovery facility. Moreover, the broad language of the Solid Waste Management Act vests the State Department of Environmental Protection with the power to regulate recycling and reclamation facilities. Finally, the court finds that the facility at issue has been extensively regulated as evidenced by the registration process that the OCUA has undergone.

In order to understand how the court arrived at its holding, it is again necessary to review certain definitions. The Solid Waste Management Act defines "solid waste facilities" as:

> the plants, structures and other real and personal property ... constructed or operated by any person pursuant to the provisions of this or any other act, including transfer stations, incinerators, *resource recovery facilities*, sanitary landfill facilities *or other plants* for the *disposal* of *solid waste* and all other vehicles, equipment and other real and personal property and rights thereon and appurtenances necessary or useful and convenient for the collection or disposal of solid waste in a sanitary manner. [*N.J.S.A.* 13:1E–3(h); emphasis supplied]

Additionally, a "solid waste facility" is defined as: *"any system, site, equipment or building which* is *utilized for* the storage, *collection, processing, transfer,* transportation, separation, *recycling, recovering* or *disposal* of *solid waste." N.J. A.C.* 7:26–1.4; emphasis supplied. The act states further that: "'resource recovery' means the collection, separation, recycling, and recovery of metals, glass, paper and other materials for reuse or for energy production." *N.J.S.A.* 13:1E–3(o).

While the Solid Waste Management Act does not specifically define "resource recovery facility," the Administrative Code provides that it "means any place, equipment, device or plan designed and/or operated to separate or process solid or liquid waste into usable secondary materials, including fuel and energy." *N.J.A.C.* 7:26–1.4. The act defines a "recycling facility" as "any solid waste facility utilized to separate or process solid waste into marketable materials." *N.J.S.A.* 13:1E–3(p). The Administrative Code further characterizes a "recycling" or

"reclamation facility" as "any place, equipment or plant designed and/or operated for the purpose of recycling or reclamation as defined above, to collect, store, process or to redistribute separated waste so as to return the material to market." *N.J.A.C.* 7:26–1.4.

As noted by defendant in its second supplemental brief, there exists an "overlapping" among the definitions of "resource recovery facility" and "recycling" or "reclamation facility." Whether the new facility proposed by the OCUA is termed a reclamation, recycling or resource recovery facility, it remains a solid waste facility to which the Solid Waste Management Act and accompanying regulations apply. *See N.J.S.A.* 13:1E–3(h) and *N.J.A.C.* 7:26–1.4.

■ Having concluded that sludge is solid waste and that the proposed project is a solid waste facility, the final question concerns preemption. The issue is whether the Solid Waste Management Act preempts the area so as to render inapplicable local zoning and planning regulations.

In *Overlook Terrace Mgmt. Corp. v. Rent Control Bd. of West New York*, 71 *N.J.* 451 (1976), the Supreme Court delineated five questions or factors to be considered when determining whether preemption applies. Having reviewed the Solid Waste Management Act and accompanying regulations, the Appellate Division later applied those five factors and concluded that a landfill operator need not obtain local site plan approval for an access road. The court found total preemption by the State in the area of solid waste management. *Chester Tp. v. DEP*, 181 *N.J.Super.* 445 (App.Div.1981).

As mandated by *Overlook Terrace Mgmt. Corp.*, the five factors regarding preemption considered by this court are as follows:

1. Does the ordinance conflict with state law as to either conflicting policies or operational effect?

2. Was the state law intended, expressly or impliedly, to be exclusive in the field?

3. Does the subject matter reflect a need for uniformity?

4. Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation?

5. Does the ordinance stand "as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Legislature? 71 *N.J.* at 461–462. While the answers to the five *Chester* questions overlap, the following analysis reveals that as a whole their import to the case at bar clearly indicates preemption.

The problem of solid waste is one of statewide dimension. *See N.J.S.A.* 13:1E–2. Recognizing that the impact of the problem extends beyond local or county boundaries, the State Legislature adopted the Solid Waste Management Act wherein it stated that the policy of this State would be to establish a meaningful and responsible role in the resolution of solid waste problems. To accomplish its goal, it granted to the Department of Environmental Protection (hereinafter the DEP) and the Solid Waste Advisory Council the following powers:

... to regulate and supervise all solid waste collection and disposal facilities and operations and to register all persons engaged in the collection or disposal of solid waste in this State, but also to develop through a Statewide solid waste management plan objectives, criteria and procedures to assure the orderly preparation and evaluation of the solid waste management plans developed by every solid waste management district, and to approve, modify, or reject such solid waste management plans on the basis of their conformity with such objectives, criteria and procedures, to develop and implement such a plan where none is approved or forthcoming from any solid waste management district, to arbitrate disputes between solid waste management districts in the development and implementation of solid waste management plans, to utilize the funds received by the department from registration fees and such other funds as may be from time to time appropriated to it to support and undertake experimental projects and programs of research and development to determine the most efficient, sanitary and economical ways of collecting, disposing, limiting and utilizing solid waste, to grant funds to the districts for the formulation and development of solid waste management plans, and to take such other actions in accordance with the policies set forth in this act, all in the manner and extent hereinafter provided. [*N.J.S.A.* 13:1E–2(b)(6)]

The need for uniformity and comprehensiveness is therefore expressly evident. *Chester Tp. v. DEP*, 181 *N.J.Super.* at 451.

In the Solid Waste Management Act, the Legislature mandated that "all codes, rules and regulations adopted by the [state] Department [of Environmental Protection] related to solid waste collection and disposal shall have the force and effect of law." *N.J.S.A.* 13:1E–9. The DEP has since promulgated extensive regulations which establish a detailed permitting process. In the present case, plaintiff applicant had complied with this process before submitting its plan to defendant. As the court noted in *Chester*, the local regulation overlaps and disrupts the state regulation, thereby frustrating the purposes of the Solid Waste Management Act. 181 *N.J.Super.* at 451.

As part of its application procedure, the DEP requires an applicant for "sanitary landfills, incinerators and *other methods of disposal*" to submit an engineering design. *N.J.A.C.* 7:26–2.4; emphasis supplied. Details of the requisite engineering design submitted for "resource recovery facilities" are found at *N.J.A.C.* 7:26–2.12(d). Among other things, this design must include a descriptive statement of how the sludge will be processed and pelletized at the facility; drawings of buildings, detailing type of construction; a description of procedures in the event of equipment breakdown or power failure; a description of litter, odor, rodent, and insect, control; and enumeration of the measures to be taken to protect and monitor the quality of ground water. In the case at bar, Berkeley Township based its denial of plaintiff's application on several of the aforementioned issues, which are properly the domain of the DEP. It is therefore clear that local regulation under the present facts is duplicative and serves to frustrate the purposes of the act. *Chester, supra,* 181 *N.J.Super.* at 452.

The court in *Chester* found preemption of the township zoning ordinance after it reviewed the DEP's engineering requirements for utilization of collection vehicles so as to assure prevention of spillage of solid wastes onto the roadways of the State. *N.J.A.C.* 7:26–3.4. The court referred also to the generally explicit and detailed character of the Solid Waste Manage-

ment Regulations found at *N.J.A.C.* 7:26–1 *et seq.* The court found further that since the township concerns had been addressed by the act and accompanying regulations, local regulation was therefore unnecessary and duplicative.

The facility proposed by the OCUA, like the landfill in *Chester,* is governed by the explicit and detailed character of the Solid Waste Management Regulations. *N.J.A.C.* 7:26–1 *et seq.* Because of the nature of the proposed facility, the OCUA must likewise comply with the detailed engineering design requirements of *N.J.A.C.* 7:26–12(d), a regulatory scheme which already protects the interests the township here seeks to regulate. As trenchantly declared by *Chester, supra,* "enforcement of the provisions of the township ordinance requiring site plan approval ... would duplicate state regulation and thus may serve to frustrate the purposes of the Solid Waste Management Act." 181 *N.J.Super.* at 452. Each of the reasons for denial of plaintiff's application as set forth in the March 23, 1987 resolution are in fact issues concerning design criteria, pollution, property values and local health and safety which are covered in whole or in part by the act, and its regulations and permitting process.

Moreover, it should be noted that the comprehensive scheme contemplated by the permit process as set forth in the Solid Waste Management Act provides for local participation by township officials and members of the public. *Id.* at 453. Indeed, in the case at bar, defendant held a series of public hearings, allowing both its citizens and public officials several opportunities to voice their concerns which in turn were required to be addressed by the DEP. For those dissatisfied with the state action, a challenge to the DEP permitting process is available. *R.* 2:2–3.

Turning to the question of uniformity, the Appellate Division has noted that the "expressed policy of the [Solid Waste Management] act dictates the need for uniformity and regionalization as opposed to localization in the regulation of sanitary landfills." *Chester, supra,* 181 *N.J.Super.* at 453. This same

need for uniformity exists not only for landfills, but for all solid waste disposal activities in this State. In *Ringlieb v. Parsipanny–Troy Hills Tp.*, 59 *N.J.* 348, 350–352 (1971), the Supreme Court held that the Solid Waste Management Act creates a comprehensive plan wherein the State seeks to control all facets of the industry.

Based on the conflict created by local regulation of state concerns, the comprehensive regulatory scheme mandated by the State, as well as the need for uniformity as to the subject matter at issue, this court finds the Berkeley Township ordinance inoperative as to the OCUA regarding site plan approval and variance requirements. The State has clearly preempted from municipal regulation this aspect of solid waste management. *Overlook Terrace Mgmt. Corp., supra*, 71 *N.J.* at 459–462.

Notwithstanding the preemption here of the planning board's jurisdiction to approve or disapprove this proposed facility, the OCUA is not absolved of its responsibility pursuant to *N.J.S.A.* 40:55D–31 to submit its plans for informational purposes to the planning board. While *N.J.S.A.* 40:55D–31 does not subject the OCUA to the jurisdiction of the planning board for approval purposes, it nonetheless provides for the planning board to receive the plans of the OCUA so that the board may assimilate the project into its master plan responsibilities and make recommendations which the OCUA may accept or reject. It is assumed that such recommendations would be for the purpose of suggesting to the OCUA steps which it may take to enable the designers of the proposed project to be consistent with, to whatever extent possible, the master plan of Berkeley Township.

Projects such as the one contemplated by the OCUA may foreseeably impact on certain municipal concerns as traffic patterns, land uses, and so forth. The planning board has an ongoing duty to take these concerns into account when updating its master plan. *N.J.S.A.* 40:55D–28. To effectively perform this function, it is essential that the board be apprised,

and evaluate the impact, of such projects. Where the State Legislature acts with regard to a specific project, however, the court is aware that informational submissions pursuant to *N.J.S.A.* 40:55D–31 may not be necessary. *See New Jersey Turnpike Authority v. Sisselman,* 106 *N.J.Super.* 358 (App. Div.1969). An act of the State Legislature is certainly sufficient notice to the planning board to permit it to effectively fulfill its duty to update the master plan.

In the case at bar, the Bricktown Municipal Utilities Authority has both submitted an *amicus* brief and argued orally that this court could base its finding of preemption on a broader ground. The facts of this case, however, do not present a justiciable case or controversy with respect to the legal argument suggested by the Bricktown Municipal Utilities Authority. Moreover, inasmuch as the court has made a determination upon a ground narrower than that submitted by the Bricktown Municipal Utilities Authority, the court need not address the argument suggested by the *amicus* brief.

Based on the foregoing, the court confirms its decision reflected in its order dated May 13, 1987.