Bertram A. DRUKER et al.

v.

CITY OF BOSTON et al.

Max R. KARGMAN and William M. Kargman

v.

Thomas A. SULLIVAN et al.

Civ. A. Nos. 71–45–F, 71–2712–F.

United States District Court, D. Massachusetts.

March 19, 1976.

---

14. *Id.*

L. Klivans, Palmer & Dodge, Boston, Mass., for defendants.

William E. Hughes, Asst. U. S. Atty., Boston, Mass., for plaintiff-intervenor United States.

## MEMORANDUM OF DECISION

FREEDMAN, District Judge.

These two consolidated cases were tried without jury on February 24–26 and on March 12, 1975. Subsequently, the parties filed memoranda and requested findings and conclusions; the matter was taken under advisement on June 14, 1975. After due consideration of these materials and of the voluminous evidence offered at trial, the Court hereinafter enters its findings and conclusions in accordance with Fed.R.Civ.P. 52(a).

Before undertaking to describe the individual cases, the Court will outline briefly the major thrust of this litigation. Plaintiffs are the owners of housing developments regulated and financed under Section 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715*l*(d)(3). They are challenging the application of the City of Boston's local rent control ordinance to their projects. The principal contention of plaintiff is that the federal government fully regulates § 221(d)(3) projects; that the local rent control ordinance conflicts with the purposes and operation of the federal program; and that, therefore, such local regulation is invalid under the Supremacy Clause of the United States Constitution, Article VI, Clause 2.[1] The complaints seek declaratory judgments that the orders of the local rent board which prescribe lower maximum rents than those permitted by the federal authorities are null and void.

Chapter 11 of the Ordinances of 1970 was enacted by the Boston City Council in December 1970. It provided for the creation of a city rent board and empowered it, *inter alia,* to regulate rents in § 221(d)(3) housing. Under that ordi-

Robert J. Sherer, Boston, Mass., for Bertram A. Druker.

Thomas G. Dignan, Jr., Ropes & Gray, Boston, Mass., for Max R. Kargman and William M. Kargman.

T. H. Martin, Law Dept., City of Boston, Boston, Mass., Brian M. Olmstead, Mark Stern, East Boston, Mass., Robert

---

1. Plaintiffs in *Kargman* also allege that the actions of the local officials violate the Contract Clause of the Constitution, Article 1, § 10, and the Equal Protection Clause of the Fifth and Fourteenth Amendments.

nance either tenant or landlord had a right to a hearing before the Rent Board. The instant cases challenge that scheme of local regulations.

The 1970 ordinance expired by its terms on December 31, 1972, but was replaced by Chapter 19 of the Ordinances of 1972; the later ordinance likewise purported to control the rents which plaintiffs could charge in their § 221(d)(3) projects.

As earlier noted the housing developments in this case were constructed under the provisions of § 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715*l* (d)(3). To qualify, developers must be limited dividend corporations. That is, the owners are restricted to a return of 6% of the initial equity investment. The Department of Housing and Urban Development ("HUD") insures the mortgages and exercises broad regulatory powers, including the regulation of rents. Plaintiffs in these cases have entered into regulatory agreements with the Federal Housing Administration ("FHA"), the cognizant HUD agency. The standard form of that agreement provides, in relevant part:

> Owners shall make dwelling accommodations and services of the project available to occupants at charges not exceeding those established in accordance with a schedule approved in writing by the Commissioner. Such accommodations shall not be rented for a period of less than thirty days or for more than one year.

> The Commissioner will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

> (1) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and

maintenance expenses over which owners have no effective control, or

> (2) Deny the increase stating the reasons therefor.

*The Druker Case:*

The plaintiffs in the earlier filed case are Bertram A. Druker and Donald Weiner, executor of the Estate of Joseph J. Gottlieb. They constitute a partnership[2] known as Castle Square Associates and own and operate Castle Square, a § 221(d)(3) housing development. Defendants in this action are the City of Boston and the individual members of the presently constituted Rent Board. Defendant-intervenors are residents of Castle Square. Plaintiff-intervenor is the Secretary of Housing and Urban Development who intervened after being requested to do so by the Court of Appeals at an earlier stage of the proceedings.[3]

In 1969, Castle Square applied to FHA for rental increases of $28 per unit, per month. Increases were approved but in the amount of $22 per unit in two steps: $11 per unit effective on February 1, 1970; $11 per unit effective on February 1, 1971. The first phase of the increase was subsequently put into effect. The second $11-increase was blocked by the Rent Board acting pursuant to the 1970 ordinance which had been enacted after the approval by FHA but prior to the effective date of the increase. After complying with Rent Board procedures, an increase of $5 per unit was ultimately granted by that body.

*The Kargman Case:*

This case is somewhat more complicated factually, but presents essentially the same issue. The Kargmans are the general partners of three limited partnerships: Brandywyne Village Company ("Brandywyne"), Camelot Company ("Camelot"), and High Point Village

---

**2.** Partnerships are within the definition of "corporations" for purposes of the statute. 24 C.F.R. § 221.510(c).

**3.** The Court deems it unnecessary to recount the circuitous route of this case. Earlier

stages in the litigation are reported at 322 F.Supp. 1126 (D.Mass.1971), 334 F.Supp. 861 (D.Mass.1971), 458 F.2d 1272 (1st Cir. 1972), and 1972 Mass.Adv.Sh. 1655, 287 N.E.2d 801 (1972).

Company ("High Point"). Each of the partnerships owns a § 221(d)(3) development located in the City of Boston. Defendants here, as in *Druker*, are the City of Boston and the individual members of the Rent Board. Defendant intervenors are residents of the three projects. HUD has not intervened as a party plaintiff in the Kargman case.

*Brandywyne* : On May 20, 1971, Brandywyne applied to HUD for rent increases. HUD granted a portion ($4–$6 per unit, per month) of the request and ordered the increases to be effective on August 1, 1971. Tenants' complaints to the Rent Board resulted in hearings before that body. On October 16, 1971, the Rent Board denied the rent increase which HUD had granted and ruled that Brandywyne could obtain no further rent increases until April 1, 1972.

Brandywyne applied to HUD for further rent increases in 1972; these increases of $5.–$7.50 per unit over what HUD had granted in 1971 (thus $9.–$13.50 more than the Rent Board had permitted) were allowed. Tenants were notified that the higher rents would be in effect as of May 1. As a consequence of tenant complaints the Rent Board again conducted hearings. On October 26, 1972, the board allowed an increase, but only part of what HUD had permitted.

Plaintiffs offered detailed figures as to the difficult financial circumstances in which Brandywyne has found itself during the cognizant period (1971–1974). It is enough to say that the investors have received no dividends since 1971 and that the mortgage is in default.

*Camelot* : In April 1971, Camelot requested rent increases; on July 21, 1971, HUD granted part of the requested increases. As in the case of Brandywyne, the Rent Board responded to tenant complaints, held hearings, and on October 16, 1971, denied the previously granted HUD increases of $9–$13 per month. The decision of the board provided further that Camelot could not obtain any increases until April 1, 1972.

Camelot applied to HUD in 1972 for additional rent increases of $6.–$7.50 beyond the $9–$13 allowed in 1971. The higher rents were allowed and tenants were notified that they would be effective on May 1, 1972. The Rent Board conducted hearings after tenant complaints. On October 26, 1972, the board rendered its decision which approved only a part of the HUD-allowed increase.

Since the advent of rent control in 1971, Camelot's financial condition has been in a declining state. In the last quarter of 1973 and for the year 1974, no principal payments or deposits to replacement reserve were made; investors were paid no dividends during this period. The project is currently in default on its mortgage.

*High Point* : The High Point rent setting history is complicated for reasons not here material. For purposes of the issue at bar it need only be noted that in 1971 rent increases were applied for and granted by HUD. Subsequently, hearings were held by the Rent Board and in a decision on October 14, 1971, the requested increases were denied. High Point is not in such serious financial straits as are Brandywyne and Camelot, but it is nonetheless in default on its mortgage.

The Court next turns to a consideration of the ordinances in question which plaintiffs allege conflict with the federal statute. The purpose and necessity for Chapter 11 of the Ordinances of 1970 are clearly set forth in the preamble to the ordinance:

> . . . a substantial and critical shortage of safe, decent and reasonably-priced rental housing units exists because of (1) the deterioration and demolition of existing housing, (2) an insufficient supply of new housing, and (3) inadequate municipal tools presently available to regulate residential rents.

The ordinance went on to provide a system for controlling rents while ensuring that landlords would receive "a fair net operating income from housing accom-

modations." This ordinance included within its coverage § 221(d)(3) housing. When Chapter 11 expired on December 31, 1972, it was replaced by Chapter 19 of the ordinances of 1972. It purpose was identical to that of the earlier ordinance. The City had adopted Chapter 842 of the Acts of 1970 which was the state rent control enabling legislation. Chapter 842, however, exempted, *inter alia*, § 221(d)(3) housing. Thus a second ordinance was required in order to include the federal programs under the provisions of rent control. The City Council reiterated its earlier premise that "the aforementioned public emergency cannot be dealt with effectively unless the rents in federally subsidized housing under the 207, 220, 221(d)(3) and 236 programs continue to be regulated by ordinance. . . ."

This brief examination of the local legislation reveals one single purpose: to ensure reasonably priced housing where market conditions are no longer able to bring about that result. To accomplish this end a hearing structure has been designed which permits landlords and tenants to be heard and to present evidence. Maximum rents may be adjusted either upward or downward, " . . . and in so doing, [the board] shall observe the principal of maintaining maximum rents for housing accommodations at levels which will yield to the landlords a fair net operating income. . . ." Chapter 19 of the Ordinances of 1972, Section 5.

The Court of Appeals for the First Circuit had occasion to examine the federal statutory scheme in *Hahn v. Gottlieb*, 430 F.2d 1243 (1st Cir. 1970). That case considered the question of whether tenants in § 221(d)(3) housing were entitled to administrative hearings on proposed rent increases and to judicial review of those hearings; it held that tenants did not have such entitlement. While the issue before me is quite different, the First Circuit's analysis of the purpose and operation of § 221(d)(3) is instructive.

The program is one of several under the National Housing Act designed to increase the supply of available housing stock for low and moderate income families. "The general goal of national housing policy is to provide 'a decent home and a suitable living environment for every American family'. 42 U.S.C. §§ 1441, 1441a." *Id.* at 1245. Private developers agree to be closely regulated by HUD in return for mortgage insurance and interest rates which are below those prevailing in the market. In addition there are substantial tax advantages to undertaking such a venture. HUD regulations limit an investor to a 6% return on equity, 24 C.F.R. § 221.532(a), and set the rent schedule at a level consistent with a "reasonable return" for the investor and "reasonable rentals to tenants." 24 C.F.R. § 221.531(c). To this end HUD reviews all net increase requests in accordance with agreements with individual investors. The *Hahn* court found that "[t]o provide low-income housing while maintaining a sound investment requires considerable adaptability." *Id.* at 1246. This flexibility which the court found to be necessary in the government/private cooperative venture was one of the principal factual bases for the court's conclusion that neither administrative hearings nor judicial review were constitutionally mandated.[4] *But see Marshall v. Lynn*, 162 U.S.App. D.C. 56, 497 F.2d 643 (1973), *cert. denied*, 419 U.S. 970, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974).

The two regulatory schemes have generally produced different results when setting rents in plaintiffs' projects. The Rent Board system of establishing rent schedules contains three essential differences from that of HUD—all operate in such a way as to yield lower rents under the city formula when the same data are used. This is true despite the testimony of former Rent Control Administrator

---

4. Tenants are now notified prior to an application for a rent increase and their comments are invited. 24 C.F.R. § 401.1 *et seq.*

John Grace that the Rent Board was attempting to work in harmony with the federal authorities:

> I would have to say that our primary concern in approaching the FHA housing which was coming into an already existing rent control system was to ensure both consistency with the existing system and consistency with the Federal system of rent control. That was the primary concern. Transcript, 3–123.

In arriving at maximum rents, HUD allows a fixed vacancy rate of 7%;[5] Boston permits 5% or the actual rate, whichever is lower. HUD permits certain expenditures to be treated as expenses while the Rent Board requires them to be classified as capital. A third difference is the fact that the Rent Board will often disallow expenses which HUD has accepted.

Plaintiffs offered evidence tending to show that the Rent Board mechanism was much slower and that it could take as long as six months to process a rent increase request. Until 1974, the board would not accept an application from a § 221(d)(3) project until HUD had approved an increase. This policy was changed in 1974; requests for rent increases can now be filed with HUD and the Rent Board at the same time.

One final distinction between the two systems should be noted. The local procedure is an adversary system with full recourse to the courts of Massachusetts. The HUD mechanism now permits tenant comments, see n.4, *supra*, but it could hardly be termed adversary. Of necessity the adversary character of the local mechanism carries with it an inherent delay factor.

Evidence was offered by the Kargman plaintiffs that the reason for the financial problems of their projects is local rent control. This was undercut to some degree by cross-examination of the Kargmans. It is nonetheless plain from the testimony that the superimposing of another layer of regulations will have some adverse financial consequences and that the lower Rent Board maximum rents compound that problem. However, I am not persuaded that such local regulation alone is enough to cause default. The Rent Board's calculations are made with a view toward providing a landlord with a "fair return." While they place a greater burden upon the landlord in justifying a rent increase, the Rent Board's procedures alone do not necessarily result in mortgage defaults.

*Conclusions*:

■ As outlined above, the principal challenge to the local rent control scheme is grounded upon the Supremacy Clause of the Constitution of the United States, Article VI, Clause 2. Analysis of a supremacy clause claim must start with the statute and legislative history. "[F]ederal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248, 257 (1963). *See, also, DeCanas v. Bica*, —— U.S. ——, 96 S.Ct. 933, 47 L.Ed.2d 43, 44 U.S.L.W. 4235 (1976). Plaintiffs argue that " . . . this case falls in that class of cases in which from the face of the statute there appears a clear Congressional design to displace coincident local regulation of the type involved here." *Plaintiffs' Consolidated Trial Brief* at 29. This Court disagrees, as has every court which has considered the question.[6]

---

**5.** There was conflicting testimony on this, but, in any event, HUD allows a fixed rate, while the Rent Board used the actual rate with a 5% ceiling.

**6.** *See, e. g., Stoneridge Apts. Company v. Lindsay*, 303 F.Supp. 677 (S.D.N.Y.1969); *Druker v. Sullivan*, 322 F.Supp. 1126 (D.Mass.1971); *Helmsley v. Borough of Fort Lee*, 362 F.Supp. 581 (D.N.J.1973); *Kargman v. McCusker*, No. 3085, Housing Court of the City of Boston (March 1, 1976).

Nothing on the face of the statute or in the legislative history supports this contention. Landlord/tenant relations have been traditionally a matter of local interest, *see, e. g., Lindsey v. Normet,* 405 U.S. 56, 68, 92 S.Ct. 862, 871, 31 L.Ed.2d 36, 47–48 (1972). The question for this Court is whether the operation of local rent control has frustrated the purposes and objectives of the National Housing Act by regulating rents in § 221(d)(3) projects.

Since the Court is presented with a case in which there has been no express preemption, the issue is not unlike the one confronted in *ITT v. Minter,* 435 F.2d 989 (1st Cir. 1970). There the Court of Appeals set up the framework for dealing with cases in which the preemption issue was not clear from the face of the statute:

> Where Congress has not clearly manifested its purpose to exclude state action which takes the form of exercise of its historic police powers, such state action will not be invalidated under the Supremacy Clause, "in the absence of persuasive reasons", *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or unless the administration of state law "palpably infringes" upon the federal policy. *Southern Pac. Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 766, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).

*Id.* at 992–3.

■ I find that the differences in the procedures used by the Rent Board and the delay and expense inherent in this additional step in the rent setting procedure have created an impermissible conflict between the federal and local systems. Accordingly, the orders of the Rent Board are invalid as to plaintiffs' projects. I reach this conclusion after careful consideration of the procedures and interests involved. It is a close question, but one on which plaintiffs are entitled to prevail.

Defendants have made much of the fact that only *maximum* rents were controlled by HUD. The argument is that to set rents lower than the HUD maximum, as the Rent Board often does, creates no conflict since lower rents do not violate the prescribed maximum. While the language of the regulation would seem to indicate that the federal authorities were concerned only with maximums, the evidence was clear that the rents set by HUD were, in effect, no higher than necessary to provide for debt service, expenses and investor return. Thus from a practical standpoint the rents set were the minimum necessary to effect the goals of the National Housing Act.[7] The difference in formula between the Rent Board and HUD necessarily yielded lower rents under the Rent Board procedure where the same data were used. This resulted in Rent Board schedules which did not yield rents sufficient to cover plaintiffs' debt service, expenses and investor return. The matter was exacerbated by delay inherent in the local system.

In noting the delays inherent in the local system I do not intend to absolve plaintiffs of responsibility in the delays in processing requested increases. Both sides of the controversy undoubtedly contributed to these delays. Regardless of the reasons, however, it took the local board up to six months to process requests for increases. These time-consuming procedures necessarily had adverse financial consequences for plaintiffs.

Defendant Rent Board maintains that its accounting procedures were more sound than those of HUD. The City argues that the Kargman properties' problems arise from a host of management difficulties unrelated to rent control. The Court observes that both of these contentions may well be valid, but these issues are beyond the scope of the instant case. The fact is that the two schemes of regulation are in conflict;

7. As of October 22, 1975, the phrase "maximum permissible rents" has been deleted. *See*

thus the federal program must preempt the field.

Through the course of this litigation it has not always been easy to ascertain HUD's position with respect to local rent control. It was not until more than two years into this litigation that it became a plaintiff intervenor—and then at the instance of the Court of Appeals. *See, Druker v. Sullivan,* No. 71–1379 (1st Cir. November 28, 1972), at 2. HUD had rejected an earlier offer to intervene made by the district judge.

Although the allegations of HUD's complaint are no substitute for competent evidence of preemption, the Department's entry into the *Druker* case on plaintiffs' side is entitled to some weight. Apparently, HUD's position on local rent control was in its formative stages at the time. It was proceeding on a case by case basis. When the Department decided to intervene it was looking at the same evidence of conflict that this Court now has before it. Thus, while I accord some deference to HUD's position my conclusion in this case is based principally upon the evidence of conflict between the two regulatory schemes.

Effective February 26, 1975, HUD promulgated a proposed regulation, 40 Fed. Reg. 8189, which in essence declared HUD's intention to preempt local rent control in cases of this nature.[8, 9] Each side argues that HUD's decision to preempt the field by this regulation supports its position. A careful reading of the history of HUD's treatment of the local rent control issue would seem to indicate that its decision resulted from a realization of the conflict with national policy created by certain local rent stabilization programs. This did not signal a change of policy as argued by defendants. Rather, it seems to have been a codification of policy which had been evolving as HUD gained experience with the operation of local rent control.

In view of the fact that this case was tried and has been decided on the Supremacy Clause issue, the Court finds it unnecessary to reach the Kargman plaintiffs' contentions with respect to the Contract Clause and the Equal Protection Clause.

Plaintiffs are ORDERED to submit a proposed form for declaratory judgment consistent with this memorandum.

---

8. This regulation was published in final form on October 22, 1975, 40 Fed.Reg. 49318. *See* 24 C.F.R. § 403.

9. This Court takes no position as to the validity of this regulation. The issue is currently being litigated before another judge of this court. *See Boston v. Secretary of HUD,* C.A.No. 75–902–C (D.Mass.).